NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11680

COMMONWEALTH  vs.  ALEX RAMOS.


Essex.     November 4, 2014. - February 26, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ.


Motor Vehicle, Receiving stolen motor vehicle.  Receiving Stolen Goods.  Search and Seizure, Exigent circumstances.  Practice, Criminal, Motion to suppress.  Evidence, Telephone conversation.  Telephone.


Indictment found and returned in the Superior Court Department on May 2, 2007.

A pretrial motion to suppress evidence was heard by Howard J. Whitehead, J., and the case was tried before David A. Lowy, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.


Todd C. Pomerleau for the defendant.
Quentin Weld, Assistant District Attorney (Elin H. Graydon, Assistant District Attorney, with him) for the Commonwealth.


DUFFLY, J.  The defendant was indicted on a charge of receiving

a stolen motor vehicle, G. L. c. 266, § 28; a codefendant was indicted

on charges of receiving a stolen motor vehicle and of receiving stolen

property with a value exceeding $250. The defendant sought to suppress evidence seized as a result of a warrantless search of his garage. A Superior Court judge, who was not the trial judge, denied the motion, concluding that the warrantless search of the defendant's garage was permissible due to exigent circumstances, and also that the search was permissible under what he termed an "accomplice sweep" exception to the warrant requirement, a concept that has not been adopted in the Commonwealth. Following a joint trial, a Superior Court jury convicted the defendant and acquitted the codefendant. The defendant appealed, and we transferred the case to this court on our own motion.

On appeal, the defendant claims error in the denial of his motion to suppress evidence seized during the warrantless search of his garage, and the admission in evidence of inculpatory statements made during recorded telephone conversations between the defendant and the codefendant. Additionally, the defendant argues that the Commonwealth's evidence was insufficient to support his conviction. We conclude that there was no error in the denial of the defendant's motion to suppress because police entry into the garage was justified based on exigent circumstances, there was no error in the admission of recordings of the jailhouse telephone calls, and the evidence was sufficient to support the defendant's conviction.

Evidence at trial. We summarize the facts the jury could have

found, reserving additional facts for our discussion of the issues.

On the morning of April 8, 2007, Derek Lam noticed that his blue Honda Civic automobile was missing from the driveway of his fiancée's house in Natick. He contacted police to have the LoJack transmitter[1] in the vehicle activated. Officer Robert Avery of the Lynn police department was on patrol in his police cruiser when, shortly after noon, he received a LoJack signal. Other officers used their LoJack units to assist him in pinpointing the location of the signal, a detached garage behind a house located at the corner of Gardiner and Florence Streets in Lynn. The house fronted on Gardiner Street, and the two-bay garage doors opened onto Florence Street. The yard between the house and the garage was enclosed by a stockade fence. Along the Florence Street side of the yard, the fence ran from the garage to the back of the house; on the other side of the yard, a stockade fence ran from Gardiner Street to Florence Street along the property line between the defendant's house and the house next door.

---

[1] Officers Robert Avery and Josh Hilton of the Lynn police department testified that the LoJack motor vehicle recovery system assists police in locating a stolen vehicle. When a vehicle equipped with a LoJack system is stolen, police activate the LoJack signal; a police vehicle equipped with a receiver will receive the signal if the two vehicles are in close proximity. The LoJack unit in the cruiser has a small display screen that shows the strength of the signal and a directional grid indicating the general direction of the stolen vehicle in relation to the cruiser. The receiver emits a beeping noise that increases in volume as the cruiser approaches the stolen vehicle.

Avery parked his cruiser on Florence Street near the two-bay garage doors. When he got out of his cruiser, he could hear noises, like metal tools being used, coming from behind one of the garage doors. One of the overhead garage doors was open about three inches at the bottom. Avery approached the garage door and, after knocking and announcing "Lynn Police," he could hear the sound of tools dropping and people running. Avery saw three men run from the back of the garage and through the back yard to the rear porch of the house; they were taken into custody immediately. After surrounding the property and obtaining a search warrant, officers found the defendant hiding inside the house. Police found the blue Honda Civic inside the garage, where the defendant, the codefendant, and two other men had been stripping its engine and various other parts.

Discussion. 1. Motion to suppress. Prior to trial, the defendant moved to suppress all evidence found during the warrantless search, and all evidence seized and statements made following execution of a warrant obtained as a result of that search.[2] After conducting an evidentiary hearing over two days at which three members of the Lynn police department testified, a Superior Court judge denied the motion. In reviewing a decision on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error 'but

_____

[2] On appeal, the defendant does not pursue any claim regarding statements he made to police after his arrest.

conduct an independent review of [the] ultimate findings and conclusions of law.'" Commonwealth v. Colon, 449 Mass. 207, 214, cert. denied, 552 U.S. 1079 (2007), quoting Commonwealth v. Scott, 440 Mass. 642, 646 (2004).

a. Evidence at motion hearing. We recite the facts found by the motion judge, supplemented by additional, undisputed facts where they do not detract from the judge's ultimate findings and were implicitly credited by the judge. See Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008), and cases cited (court "may supplement judge's findings of fact if the evidence is uncontroverted and undisputed and where the judge explicitly or implicitly credited the witness's testimony").

On April 8, 2007, Avery detected a LoJack signal while driving his cruiser on Park Lane Avenue in Lynn. He confirmed the signal with a police dispatcher and was informed that the signal was coming from a Honda Civic reported stolen in Natick. Avery followed the signal to a location at the corner of Florence and Gardiner Streets in Lynn. The house at that address fronted on Gardiner Street. The doors to a two-bay detached garage located behind the house opened onto Florence Street. Avery parked his police cruiser in the middle of Florence Street, near the garage bay doors. The garage was separated from the house by a yard which was surrounded by a stockade fence.

Officer Josh Hilton of the Lynn police department, who also had

followed the LoJack signal, arrived at about the same time as Avery. Hilton parked his cruiser, walked over to the fence, and looked over it to see if the Honda Civic was inside the yard. He saw three automobile doors and other motor vehicle parts in the yard, but did not see an automobile. Hilton broadcast this information over his police radio. Hilton and Avery learned from another officer who heard Hilton's broadcast that the defendant lived at the Gardiner Street address; he was under investigation for running a "chop-shop"[3]; he previously had pleaded guilty to charges related to the theft of motor vehicles and stripping parts from stolen vehicles; and a resident of Chelsea whose vehicle had been stolen had located the vehicle's engine at the Gardiner Street address. Based on this, the officers were advised that the Gardiner Street address might be a "chop shop."

Avery approached the garage bay door, where he could hear the sound of metal tools and what sounded to him like work being done on automobiles. He knocked on the door and announced, "Lynn Police." At that point, Avery heard tools being dropped and people running. He told Hilton what he had heard; Hilton looked over the fence and saw two people running out of the garage toward the house. Avery also

---

[3] Officer Steven Withrow of the Lynn police department testified that a "chop shop" is a "building or garage" where vehicles, stolen or otherwise, "are brought [and] stripped of their parts." See United States v. Fuentes, 107 F.3d 1515, 1517 n.1 (11th Cir. 1997) ("'chop shop' operation involves dismantling stolen automobiles and selling their parts").

looked over the fence and saw three men running out of a regular door at the back of the garage, into the yard, and toward the house. When Avery ran around to the driveway side of the house, he saw only two men.

By that time, a third officer had arrived. The officers persuaded the two men to stop running and to jump over the fence, where the officers placed the men in handcuffs "for officer safety." A neighbor signaled to the officers that a third person was hiding under a large pile of trash bags on the porch. Avery and Hilton entered the yard. Hilton located the codefendant, Warlin Santiago, under the pile of trash bags, and noted that his hands were covered in black grease. Avery then walked through the yard, back to the garage door from which the men had emerged, and looked inside. Avery could see a stripped, blue Honda Civic; he entered the garage, looked at the vehicle identification number (VIN), and confirmed that the VIN was that of the stolen vehicle the officers had been tracking.

After other officers arrived, police secured the area by surrounding the property while they sought a search warrant for the garage and the house; they believed that the defendant was inside the house. The warrant was obtained a few hours later and the defendant was arrested after he was found hiding inside the house.

b. Justification for warrantless entry. The defendant contends that the warrantless search of the garage violated his rights

under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. "In the absence of a warrant, two conditions must be met in order for a nonconsensual entry to be valid: there must be probable cause and there must be exigent circumstances" (footnote omitted). Commonwealth v. DeJesus, 439 Mass. 616, 619 (2003). The defendant does not challenge the judge's finding that "the police had probable cause to believe that the stolen car was in the garage, was being dismantled and that the people fleeing were involved in the theft and dismantling." The defendant argues, however, that the warrantless entry into the garage was not justified by exigent circumstances, because there were no exigent circumstances, and that the motion judge's reliance on the "accomplice sweep" exception was erroneous, because no such exception has been adopted in Massachusetts.

The Fourth Amendment requires that "all searches and seizures must be reasonable," and that "a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." Kentucky v. King, 131 S. Ct. 1849, 1856 (2011). Generally, a warrant must be secured before a search is conducted, and warrantless searches "are presumptively unreasonable." Id. Because the touchstone of the Fourth Amendment is reasonableness, however, "the warrant requirement is subject to certain reasonable exceptions." Id., citing Brigham City v. Stuart,

547 U.S. 398, 403 (2006). Although "searches and seizures inside a home without a warrant are presumptively unreasonable," id., this presumption may be overcome when "'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." Kentucky v. King, supra, quoting Mincey v. Arizona, 437 U.S. 385, 394 (1978).

"Exigencies which may justify a procedure without warrant are a narrow category and must be established by the Commonwealth which bears the burden of proof." Commonwealth v. Young, 382 Mass. 448, 456 (1981). Among the exigencies providing justification for a warrantless entry into a home is an officer's reasonable belief that the entry is necessary to prevent "the potential loss or destruction of evidence." Commonwealth v. DeJesus, supra at 620. See Commonwealth v. Molina, 439 Mass. 206, 209 (2003); Commonwealth v. Huffman, 385 Mass. 122, 125 (1982). "[W]hether an exigency existed, and whether the response of the police was reasonable and therefore lawful, are matters to be evaluated in relation to the scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis." Commonwealth v. Young, supra.

Here, two officers used LoJack receivers to identify the garage as the probable location of the stolen vehicle. They knew by the time

they had arrived at the garage that it was suspected of being a "chop shop" where stolen vehicles would be dismantled and their VIN numbers destroyed. Avery heard the sounds of ratchets and wrenches from inside the garage, and after he knocked and announced his presence, he heard the sound of tools being dropped and people yelling. The officers did not know how many people were inside the garage. Before searching the garage, they had learned that the defendant, who lived at that address and who had been involved in previous motor vehicle thefts, was not among the men apprehended in the yard. One of the men who had been apprehended initially had attempted to conceal himself from police and was found hiding under a pile of trash bags. The rapidly unfolding events occurred at a point when only three officers were on the scene, although others continued to arrive.[4] In these circumstances, it would have been objectively reasonable for an officer to believe that he needed to enter the garage and conduct a limited search in order to prevent further destruction of the vehicle, or the removal of the stolen vehicle's parts, license plate,

---

[4] The defendant suggests that "[t]here were approximately seven to eight officers on the scene" by this point. Avery testified that he was not certain if there were four officers in the yard by the time the three fleeing men had been captured and he turned his attention to the garage. Officers continued to arrive as events unfolded, and Hilton testified that, at some point, there were at least seven or eight officers present, four of them in the yard. The judge made no finding as to the number of officers who ultimately arrived on the scene.

or VIN number, by any individual who might have remained in the garage. Cf. Commonwealth v. Grundy, 859 A.2d 485, 488-489 (Pa. Super. Ct. 2004) (probable cause and exigent circumstances existed where police officers followed LoJack signal to garage suspected of being "chop shop" and, upon arrival, heard sound of power saw). "If the police had taken the time to first seek a warrant," they reasonably could have believed that "the [vehicle] would have been in parts and junk by the time they got back . . . [because] a car can be disassembled in a matter of minutes." Id.

The defendant argues that even if there were a risk that evidence would be destroyed when the officers first arrived, the exigency had been extinguished by the time Avery knocked and announced his presence, because it could be inferred from the sounds of running that anyone who had been inside had fled the premises. We do not agree that a reasonable police officer was required to have relied on such an inference. At that point, it was not clear how many individuals were involved in the activities inside the garage, or whether any of them had remained to destroy or remove evidence that might provide a link to the stolen vehicle. An officer reasonably could have believed that evidence, including license plates or VIN number plates, was being destroyed, or that such identifying information or other evidence such as automobile parts was being removed from the garage through the partially open bay doors that faced away from the yard

where police were actively engaged in apprehending other suspects.

There were also other factors present that reasonably may be considered in determining whether an exigency justifies an entry, among them "a clear demonstration of probable cause, strong reason to believe that the suspect was in the dwelling, and a likelihood that the suspect would escape if not apprehended." See Commonwealth v. Viriyahiranpaiboon, 412 Mass. 224, 227 (1992). Here, the officers had probable cause to believe that a chop shop operation was being conducted in the defendant's garage that involved the disassembly of stolen motor vehicles. Because the defendant, who lived at the address and previously had pleaded guilty to charges of stealing a motor vehicle, was not among the men who had been apprehended in his yard, the officers had reason to believe that he might still be in the garage destroying evidence. As the garage bay doors faced away from the yard and the house and onto the street, the defendant had a route of escape if he was not apprehended. The judge made no finding, and the record does not show clearly, that at the time Avery made his entry into the garage, there were officers who were not engaged in securing the residence or detaining the other three suspects, who would have been available to secure the garage while a warrant was obtained.

The warrantless entry into the garage was therefore justified by reason of exigency. Once inside, Avery's observation of the blue

Honda, the license plate on its seat, and the VIN number plate numbers, permitted him "on that basis to make a selective seizure." Commonwealth v. Young, supra at 459. Accordingly, there was no error in the judge's decision to deny the motion to suppress.[5]

2. Jailhouse telephone calls. The defendant maintains that the admission in evidence of two recorded telephone conversations between himself and Santiago, his codefendant, while the defendant was in custody awaiting trial, denied him a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. We do not agree.

On cross-examination, Santiago stated that he had never met the defendant before the day they were arrested, he had not seen the defendant in the garage, and he first spoke with the defendant while they were both in custody as a result of that incident. The prosecutor asked if Santiago was angry at Jorge Orozco, one of the men caught running out of the garage, who testified under a plea agreement providing that, in return for his cooperation, he would receive no

---

[5] Because we conclude that exigent circumstances justified the warrantless search, we need not address the issue of the so-called "accomplice sweep" exception to searches conducted without a warrant. We note that the United States Supreme Court has not adopted such an exception, and there appears to be no consensus as to the precise scope of such an exception in other States that have considered it in some form. See 3 W.R. LaFave, Search and Seizure § 6.4(b) (5th ed. 2012).

jail time. Santiago replied, "a little, yes." The prosecutor then inquired about a number of statements Santiago made to the defendant during recorded jailhouse telephone calls, after Santiago had been released on bail. Santiago denied having made any of the statements, including, inter alia, calling Orozco a "snitch"; saying that the defendant had told Santiago to say Orozco would pay him to remove the engine; saying that Santiago told the defendant to "bring [Orozco] some money"; and that the defendant told Santiago to "[s]ink [Orozco] so that [he] can't get out [of it]."

The prosecutor then told the judge that she intended to introduce recordings of the two jailhouse calls between Santiago and the defendant to impeach Santiago. The defendant's counsel requested a mistrial, stating first that he had only just "got wind that there's a possibility, yesterday, that some jail tapes are coming into evidence." Counsel added that, after examining the only computer disk he had, he determined that it did not contain copies of the recorded calls. The prosecutor noted that the Commonwealth had provided a copy of a compact disk of the jailhouse calls during discovery, two years before trial, to which counsel replied that, if the disk had been supplied, he no longer had it. The judge then inquired as to counsel's grounds for seeking a mistrial. Counsel first replied that the evidence was being introduced due to a codefendant testifying at trial, and that he would have filed a motion

pursuant to Commonwealth v. Moran, 387 Mass. 644 (1982) (Moran), had he been aware that the prosecution intended to introduce that evidence. He also argued that allowing the Commonwealth to introduce the jailhouse calls would create a disparity with his motion to exclude uncharged criminal acts, which had been allowed. The judge allowed the prosecutor to introduce the recorded statements.

The defendant maintains that the admission of inculpatory statements he made during the recorded telephone calls was improper under Bruton v. United States, 391 U.S. 123 (1968) (Bruton), and Moran, supra at 655, and that a new trial is therefore required. Neither case, however, is applicable here. In Bruton, supra at 126, the United States Supreme Court concluded that the admission in a joint trial of a nontestifying codefendant's inculpatory statement violated the defendant's right to confrontation. Here, as in Moran, supra, the codefendant testified, so there was no denial of the defendant's right to confrontation. Instead, the court determined in that case that severance of the defendants' joint trial was necessary because the defendants put forth mutually antagonistic defenses. Id. at 659 ("The only realistic escape for either defendant was to blame the other"). "Such 'mutual antagonism' only exists where the acceptance of one party's defense will preclude the acquittal of the other." Id. at 657.

Here, by contrast, the defendant's and Santiago's defenses were

not mutually inconsistent. Both the defendant and his codefendant relied on a defense that they were being framed and that Orozco fabricated his testimony implicating each of them. They both argued that Orozco's statements were false, and that Orozco was not believable because he was testifying in exchange for no jail time, and that his testimony had changed over time. In addition, the defendant argued that he was not present in the garage, and therefore could not have been in possession of the stolen vehicle. Santiago also argued that he did not know the vehicle was stolen.

In Moran, supra at 652, the codefendant's defense implied that the defendant had committed the crime alone. There, accepting the codefendant's defense would have precluded the acquittal of the defendant. See id. at 659. Acceptance of Santiago's defense, however, would not have precluded acquittal of the defendant. Indeed, acceptance of Santiago's defense could have led to the conclusion that the defendant, too, should be acquitted, because Orozco was lying about both of their actions. The fact that the defendant was convicted while Santiago was acquitted does not render their defenses antagonistic. Santiago's acquittal and the defendant's conviction shows that the jury credited Santiago's defense that he did not know the vehicle was stolen, and did not credit the shared defense that Orozco was fabricating his testimony. In sum, there was no error in the admission of the recorded jailhouse telephone

calls.

3. <u>Sufficiency of the evidence</u>. The defendant's motions for a required finding of not guilty, presented at the close of the Commonwealth's case and again at the close of all the evidence, were denied. On appeal, the defendant continues to press his argument that the evidence was insufficient to support his conviction because it did not establish that he possessed the stolen motor vehicle.

In reviewing the denial of a motion for a required finding, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Commonwealth</u> v. <u>Latimore</u>, 378 Mass. 671, 677, quoting <u>Jackson</u> v. <u>Virginia</u>, 443 U.S. 307, 318-319 (1979).

The offense of receiving a stolen motor vehicle requires the Commonwealth establish that (1) the motor vehicle was stolen; (2) the defendant received the motor vehicle; and (3) the defendant knew that the motor vehicle was stolen. See G. L. c. 266, § 28 (<u>a</u>).[6]

---

[6] General Laws c. 266, § 28 (<u>a</u>), provides, in relevant part:

> "Whoever steals a motor vehicle or trailer, whoever maliciously damages a motor vehicle or trailer, whoever buys, receives, possesses, conceals, or obtains control of a motor vehicle or trailer, knowing or having reason to know the same to have been stolen, or whoever takes a motor vehicle without the authority of the owner and steals from it any of its parts or accessories, shall be punished . . . .

"'Receiving' [stolen property] means acquiring possession" or control of it.  Commonwealth v. Cromwell, 53 Mass. App. Ct. 662, 666 n.6 (2002), quoting American Law Institute, Model Penal Code and Commentaries § 223.6 (1985).  See Commonwealth v. Aponte, 71 Mass. App. Ct. 758, 760 (2008).  "[P]ossession need not be exclusive.  It may be joint and constructive, and it may be proven by circumstantial evidence."  Commonwealth v. Namey, 67 Mass. App. Ct. 94, 98 n.7 (2006), quoting Commonwealth v. Brown, 50 Mass. App. Ct. 253, 257 (2000).  "Actual and constructive possession, however, require 'knowledge plus ability and intention to control.'"  Commonwealth v. Namey, supra, quoting Commonwealth v. Fernandez, 48 Mass. App. Ct. 530, 532 (2000).

The defendant argues, in reliance on Commonwealth v. Campbell, 60 Mass. App. Ct. 215, 217 (2003), that his mere presence in the vicinity of the stolen vehicle was not sufficient to establish that he possessed it, given the absence of evidence indicating how and for how long he had been associated with the vehicle.  In that case, the Appeals Court held that a defendant's presence without more did not prove possession.  Contrary to the defendant's arguments, the

"Evidence that an identifying number or numbers of a motor vehicle . . . or part thereof has been intentionally and maliciously removed, defaced, altered, changed, destroyed, obliterated, or mutilated, shall be prima facie evidence that the defendant knew or had reason to know that the motor vehicle, or trailer or part thereof had been stolen."

circumstances in this case are very different. Here, beyond mere presence in the vicinity of the vehicle, there was substantial additional evidence from which a jury could conclude that the defendant had possession of the stolen vehicle.

The jury could have found that the blue Honda Civic was located at the defendant's residence when police knocked on the garage door. Orozco testified that the defendant, Santiago, and a third man, who was a mutual friend of Orozco and the defendant, were all inside the garage stripping the vehicle of its engine and various parts when the officer knocked. The defendant had called Orozco to ask him to deliver a jack and to help remove an engine from a motor vehicle; Orozco drove to the garage, and brought the jack that the defendant had requested. At the defendant's direction, Orozco began disconnecting the engine inside a blue Honda, and removing bolts from the hood so it would be easier to take out the engine. At the same time, other men were removing the doors and other parts from the vehicle. The defendant told the men to "look for the LoJack." Just before the police arrived, Orozco had used the jack to lift up the vehicle so that the engine could be removed from underneath, and all of the men, including the defendant, were pulling the engine from the vehicle. Orozco heard the squeal of tires outside the garage doors; the defendant yelled, "Five-O!" and ran out the back door leading to the yard and the house, and the others followed. There was no error in

the denial of the motions for a required finding.

<u>Judgment affirmed</u>.